Lucas Pastor CANALES
MARTINEZ, et al.,

v.

DOW CHEMICAL COMPANY, et al.

No. Civ.A. 95–3212.

United States District Court,
E.D. Louisiana.

July 16, 2002.

Michael P. Maslanka, Attorney at Law, Houston, TX, Stephen D. Susman, James T. McCartt, Michael Lee, Sofia Androgue–Gustafson, Johnny W. Carter, Susman Godfrey, LLP, Houston, TX, Gerald Edward Meunier, Stevan C. Dittman, Gainsburgh, Benjamin, David, Meunier & Warshauer, New Orleans, LA, Fred Misko, Jr., Edward Chin, John Volney, Fred Misko, Jr., PC, Dallas, TX, Charles S. Siegel, Attorney at Law, Dallas, TX, Scott Hendler, The Hendler Law Firm, Austin, TX, for Plaintiffs.

Michael L. Brem, F. Walter Conrad, Baker Botts, LLP, Houston, TX, Charles Morris Steen, Stephanie G. McShane, Steen, McShane & Williamson, LLP, New Orleans, LA, for Dow Chemical Co.

Sherman Gene Fendler, Don Keller Haycraft, Liskow & Lewis, New Orleans, LA, D. Ferguson McNiel, Vinson & Elkins, LLP, Houston, TX, for Occidental Chemical Corp.

Mary S. Johnson, Kiskow & Lewis, New Orleans, LA, Keith Eric Gisleson, Chaffe, McCall, Phillips, Toler & Sarpy, LLP, New Orleans, LA, Thomas M. McNamara, Liskow & Lewis, Lafayette, LA, Mark A. Marino, Attorney at Law, Destrehan, LA, David Randolph Richardson, Schully, Roberts, Slattery, Jaubert & Marino, New Orleans, LA, R. Burton Ballanfant, Attorney at Law, Houston, TX, for Shell Oil Co.

Phillip A. Wittmann, Richard Edward Sarver, John P. Farnsworth, Stone, Pifman, Walther, Wittmann & Hutchinson, LLP, New Orleans, LA, Terence M. Murphy, James S. Teater, Michael L. Rice, Jones, Day, Reavis & Pogue, Dallas, TX, for Standard Fruit Co., Dole Food Co., Inc. and Dole Fresh Fruit Co.

Robert Emmett Kerrigan, Jr., Darrell K. Cherry, Deutsch, Kerrigan & Stiles, New Orleans, LA, Samuel E. Stubbs, William D. Wood, Fulbright & Jaworski, Houston, TX, for Chiquita Brands, Inc. and Chiquita Brands Intern., Inc.

Henry Bernis Alsobrook, Jr., Adams & Reese, New Orleans, LA, Robert T. Greig, Amy S. Schulman, Boaz S. Morag, Cleary, Gottlieb, et al., New York City, for Del Monte Fresh Produce, N.A.

Steven W. Copely, Ernest Enrique Svenson, Gordon, Arata, McCollam, Duplantis & Eagan, LLP, New Orleans, LA, Peter R. Paden, Bryan Cave, LLP, for Dead Sea Bromine Co. Ltd. and Bromine Compounds, Ltd.

## ORDER AND REASONS

BARBIER, District Judge.

Before the Court are defendants' **Motion to Dismiss for *Forum Non Conveniens*** and **Motion to Strike Testimony of Alejandro Garro.** Plaintiffs oppose the motions. The Court held oral argument on the motions on April 19, 2002, after which it took the matter under advisement. Now, having considered the record, the memoranda and argument of counsel, and applicable law, the Court finds the motions should be DENIED for the reasons which follow.

## BACKGROUND

The instant Motion to Dismiss requires the Court to take up an issue that has vexed federal courts for nearly 20 years: whether the Court should dismiss the claims of scores of foreign plaintiffs who claim to have been rendered sterile by a chemical produced by the manufacturer defendants[1] and utilized by the fruit grow-

---

1. The manufacturer defendants are Dow     Chemical Corporation, Occidental Chemical

er defendants [2] in banana-growing regions around the world, on the ground that this Court is an inconvenient forum. All of the direct defendants are United States corporations. The chemical in question, dibromochloropropane (commonly known as "DBCP") is a nematocide which defendants continued to use on foreign banana farms after its use in the United States was banned in 1977.[3] The instant case [4] involves plaintiffs who claim to have been exposed to DBCP on banana farms in Costa Rica, Honduras, and the Philippines.

Plaintiffs originally filed their suit in state court in Jefferson Parish, from which it was removed to this Court. On September 5, 1996, Judge Patrick Carr remanded the case based on his finding that third-party defendant Dead Sea Bromine Company, Ltd. was not a foreign state, and the matter was not preempted by federal law.[5] Following the Fifth Circuit's decision in *Delgado v. Shell Oil Co.*, 231 F.3d 165 (5th Cir.2000), holding that Dead Sea is a "for-

eign state" for purposes of the Foreign Sovereign Immunities Act, defendants again removed the case to federal court on November 15, 2000. The parties do not dispute jurisdiction or venue; the sole issue presently before the Court is the forum non conveniens question.

Arguing that the alleged exposure took place in plaintiffs' home countries, and that "virtually all of the evidence and witnesses are located there," [6] defendants contend that plaintiffs' home countries offer plaintiffs an adequate forum which also happens to be more convenient. Defendants further urge the Court to "resist plaintiffs' attempt to circumvent Delgado" and various post-*Delgado* decisions which it claims have "held conclusively that these claims should be brought in plaintiffs' home countries," [7] citing the Court to the decisions in *Patrickson v. Dole Food Co.*, Civil Action No. 97001516 HG (D.Haw. Sept. 9, 1998), *rev'd on other grounds*, 251 F.3d 795 (9th Cir.2001), *cert. granted in part, Dole Food*

---

Corporation, and Shell Oil Company. During the time this case was pending in state court, the manufacturer defendants reached settlement agreements with all but three plaintiffs. On April 19, 2002, having been informed that their claims had been settled, the Court granted a motion to dismiss filed by the last three plaintiffs with claims against the manufacturers. Accordingly, the manufacturer defendants are no longer parties to this action. *See* Rec. Doc. 160.

2. The fruit company defendants are Standard Fruit Company, Standard Fruit & Steamship Company, Dole Food Company, Inc., Dole Fresh Fruit Company, Chiquita Brands, Inc., Chiquita Brands International, Inc., and Delmonte Fresh Produce.

3. Shell has filed a memorandum taking issue with the assertion that the use of DBCP-containing pesticides was "banned" in 1977, suggesting instead that on October 27, 1977, the EPA "suspended unconditionally the registrations of pesticide products containing DBCP for use on 19 specific crops, not including bananas, and suspended conditionally the registration for use on other specific crops,

which included bananas." Rec. Doc. 162, Shell's Post–Argument Memo, 2. "On October 29, 1979, the EPA issued a Suspension Order suspending the registrations, including the interim registration amendments, for the use of pesticides containing DBCP on specific crops, including bananas." *Id.* at 3.

4. Currently, three other civil actions filed by banana workers are pending in this section, Civil Action nos. 99–3598, 99–3616, and 99–3617. Because of the complexity of the cases and the fact that the other cases involve plaintiffs from different countries, the Court treats only the instant case in this motion. However, the ruling herein obviously has implications for the other cases.

5. Under 28 U.S.C. § 1441(d), a foreign state may remove to federal court any civil action brought against it in a state court.

6. Rec. Doc. 121, Defendants' Memo in Support, 4–5.

7. *Id.* at 4–5.

*Co. v. Patrickson,* —— U.S. ——, 122 S.Ct. 2657, 153 L.Ed.2d 834 (2002) and *cert. granted in part, Dead Sea Bromine Co., Ltd. v. Patrickson,* —— U.S. ——, 122 S.Ct. 2658, 153 L.Ed.2d 834 (2002), and the *Espinola–E* cases; *see, e.g., Espinola–E v. Coahoma Chem. Co.,* Civil Action No. 96–360 (S.D.Miss. Mar. 30, 1998), *remanded by* 248 F.3d 1138, 2001 WL 85834 (Table) (5th Cir.2001).[8]

Plaintiffs counter that defendants have failed to carry their heavy burden of persuasion which requires a showing that this is one of the very rare cases where, despite the fact that the Court has jurisdiction and venue is proper, this Court should decline to exercise its jurisdiction out of consideration for the convenience of parties and witnesses. In fact, plaintiffs argue that the Court need not reach the convenience analysis, because the foreign fora advocated by defendants are unavailable and inadequate.

## DISCUSSION

### I. Motion to Strike

In connection with the motion to dismiss as it pertains to the Costa Rican plaintiffs, defendants have offered the expert testimony of Diego Baudrit; plaintiffs have offered the expert testimony of Alejandro Garro.

■ Four days before the hearing on the Motion to Dismiss, defendants filed a Motion to Strike the expert testimony of Garro, on the grounds that he is not quali-

fied to render expert testimony on the issue at hand, and further, that his testimony is not relevant or reliable, citing, *inter alia,* Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Plaintiffs take issue with both the timeliness and the substance of the motion. Pointing out that Garro's discovery deposition was taken six weeks prior to the perpetuation deposition taken for use at the hearing on the forum non conveniens motion, plaintiffs argue that the motion is the equivalent of a *Daubert* motion brought after trial testimony. The Court agrees with this assessment. Garro's qualifications, and indeed, the gist of his testimony, have been well-known to defendants for a long time. This Court's standing order requires *Daubert* motions to be filed in time to be heard 30 days prior to trial. Accordingly, defendants' motion filed shortly before the hearing and after his perpetuation deposition is untimely.

■ Further, even if it was timely, the Court finds the motion legally unfounded. The motion is premised on defendants' allegations that Garro's testimony does not comport with a variety of evidentiary rules, but strangely, does not even mention in passing Federal Rule of Civil Procedure 44.1, which governs the Court's determination of foreign law. That rule, which provides as follows, is largely determinative of

---

8. The *"Espinola–E* cases" comprise five Mississippi district court cases consolidated on appeal. Following the district courts' dismissals of plaintiffs' suits on forum non conveniens grounds, in orders which also denied plaintiffs' remand motions based on the finding that both federal question and diversity jurisdiction were present, plaintiffs appealed the denials of the remand motions. The Fifth Circuit affirmed the dismissals, holding that while no federal question jurisdiction was present, diversity jurisdiction was present in

four of the five cases. The fifth case (*Espinola–E* ) was remanded to the district court for further consideration of the jurisdictional issue, with instructions that if jurisdiction was present, the case should be dismissed for forum non conveniens. *See,* 248 F.3d 1138, 2001 WL 85834 (Table) (5th Cir.2001). The case is unpublished; the slip opinion may be found in the record at Rec. Doc. 131, Exh. B. A complete list of citations to the district court cases may be found in the record at Defendants' Memo in Support, 3.

the issue presented in defendants' motion to strike:

> A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice. **The court, in determining foreign law, may consider any relevant material or source,** including testimony, **whether or not submitted by a party or admissible under the Federal Rules of Evidence.** The court's determination shall be treated as a ruling on a question of law.

Emphasis added.

Thus, under applicable law, the Court may consider evidence not technically admissible under the Federal Rules of Evidence, so long as it is relevant.

The only argument advanced by defendants that goes to the standard set forth in 44.1 is that Garro's testimony is not relevant because his opinions on the adequacy of foreign fora were formed with reference to his own definition of "adequate" as opposed to the Fifth Circuit definition. In this vein, defendants cite to testimony from Garro in which he concedes that his opinion as to adequacy is based on "basic standards" of "meaningfulness" applicable to "any court in the world." [9] Reviewing Garro's testimony as a whole, it is clear that his "basic standards" analysis goes to the question of the fundamental fairness of the foreign courts, an inquiry which is encompassed in the Fifth Circuit and U.S. standards, as is borne out by defendants' articulation of the adequacy issue as "whether Costa Rica and Honduras will deprive plaintiffs of all remedies **or treat them unfairly.**" [10] Furthermore, to the extent Garro may have premised his opinions on standards not applicable to the

Court, the Court has either disregarded such testimony or considered that in determining what weight to accord it.

Second, defendants' argument that Garro's testimony should be discarded because of his inappropriate adequacy standard overlooks the fact that the majority of his testimony addresses the issue of **availability,** and is based on his comparative analysis of the differences between civilian and common law systems. A review of Garro's credentials—which reveal that he is a law professor at Columbia University Law School teaching comparative law, and a Senior Research Scholar at Columbia's Parker School of Foreign and Comparative Law focusing on Latin American Legal Systems—suggests that by any standard, he is qualified to opine on comparative law issues involving Latin American legal systems. Accordingly, the Court finds that defendants have not provided any legal basis for the wholesale rejection of Garro as an expert, and therefore, their Motion to Strike must be denied.

## II. *Motion to Dismiss for Forum Non Conveniens*

■ The "doctrine of forum non conveniens proceed[s] from [the] premise [that] ... [i]n rare circumstances, federal courts can relinquish their jurisdiction in favor of another forum." *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 722, 116 S.Ct. 1712, 1724, 135 L.Ed.2d 1 (1996). Under the doctrine, a court may decline to exercise its jurisdiction "if the moving party establishes that the convenience of the parties and the court and the interests of justice indicate that the case should be tried in another forum." *Karim v. Finch Ship-*

---

9. Depo. of Alejandro Garro ("Garro Depo.") (Apr. 7, 2002), 78–84.

10. Defendants' Memo in Support, 12 (emphasis added), citing *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *In re Air Crash Disaster Near New Orleans, La.,* 821 F.2d 1147, 1165 (5th Cir. 1987).

*ping Co., Ltd.*, 265 F.3d 258, 268 (5th Cir.2001).

■■■ "The doctrine of forum non conveniens presupposes at least two forums where the defendant is amenable to process and simply furnishes criteria for choice between them." *Dickson Marine Inc. v. Panalpina, Inc.*, 179 F.3d 331, 341 (5th Cir.1999). Thus, a defendant seeking a forum non conveniens dismissal must first establish the existence of an alternate forum that is both available and adequate. *McLennan v. American Eurocopter Corp., Inc.*, 245 F.3d 403, 424 (5th Cir.2001), citing *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 221 (5th Cir.2000). "A foreign forum is available when the entire case and all parties can come within the jurisdiction of that forum." *Id.* (internal quotations omitted). "A foreign forum is adequate when the parties will not be deprived of all remedies or treated unfairly, even though they may not enjoy the same benefits as they might receive in an American court." *Id.* (internal quotations omitted); *See also, In re Air Crash Disaster Near New Orleans, La.*, 821 F.2d 1147, 1165 (5th Cir.1987).

■■■ If the defendant establishes that an adequate alternative forum is available, the defendant must then demonstrate that dismissal is appropriate because the alternative forum is more convenient, based on consideration of what are known as "private interest" and "public interest" factors. *Piper Aircraft*, 454 U.S. at 241 n. 6, 102 S.Ct. at 258 (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947)). The private interest factors include: [1] the "relative ease of access to sources of proof; [2] availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; [3] possibility of view of premises, if view would be appropriate to the action; and [4] all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gilbert*, 330 U.S. at 508, 67 S.Ct. at 843. The public interest factors to be considered are: [1] the administrative difficulties flowing from court congestion; [2] the "local interest in having localized controversies decided at home"; [3] the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; [4] the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and [5] the unfairness of burdening citizens in an unrelated forum with jury duty. *Id.*, 330 U.S. at 509, 67 S.Ct. at 843. As an additional public interest factor, courts consider judicial economy—that is, whether a transfer would avoid duplicative litigation and prevent waste of time and money. *Van Dusen v. Barrack*, 376 U.S. 612, 616, 84 S.Ct. 805, 809, 11 L.Ed.2d 945 (1964).

Accordingly, the task at hand requires the Court to conduct a threshold analysis of the availability and adequacy of the fora in plaintiffs' home countries. Because the Court concludes that none of the countries of origin of the plaintiffs before it are available, adequate fora for their claims, the Court does not reach the public and private interest factors.

### *Availability & Adequacy*

### *Costa Rica*

#### *Availability*

■■■ "A foreign forum is available when the entire case and all parties can come within the jurisdiction of that forum." *In re Air Crash Disaster Near New Orleans, La.*, 821 F.2d at 1165 (citations omitted). Plaintiffs argue that Costa Rica is not available as an alternative forum, because the law in that country divests Costa Rican Courts of jurisdiction over a plaintiff's claims when the plaintiff has first filed his claim in another forum with competent jurisdiction. In support of this argument,

plaintiffs have provided the Court with expert testimony opining that is, in fact, the state of the law in Costa Rica, and also point to the *Abarca* and *Aguilar* cases—which were dismissed by Costa Rican courts for lack of jurisdiction following dismissal from U.S. courts on forum non conveniens grounds—as examples in which this has occurred.

Defendants, in contrast, have submitted the testimony of their expert, Diego Baudrit, suggesting a differing interpretation of relevant Costa Rican Code of Civil Procedure articles. They rely on *Delgado* for the proposition that another federal court has already found Costa Rica an available and adequate forum for precisely the claims presented here, and further argue that plaintiffs' underhandedly obtained the *Abarca* dismissal from the Costa Rican court, when in fact, the cause of action could have been styled in such a way that the court would have accepted jurisdiction. They also argue that the position advanced by plaintiffs and their expert requires the Court to reach the absurd result that a case first-filed in the United States can never be transferred for forum non conveniens to a civilian jurisdiction without the unreserved consent of the plaintiff; and that Costa Rica should not be allowed to dictate to United States judges which cases they have to hear.

### Costa Rican Law

In considering whether Costa Rica provides an available forum for plaintiffs' claims, the Court looks to the laws of that country governing the competency and jurisdiction of its courts. In conformity with the Court's order entered May 10, 2002 (Rec.Doc. 166), the parties provided the Court with true copies of the provisions consulted by their experts, in some cases in agreed upon translations. Provisions submitted in Spanish only, or in a translation that the parties could not agree upon, were referred to a court-certified translator for translation from Spanish to English. Rec. Doc. 173. As a result of this process, the Court is satisfied that the record includes accurate English translations, acceptable to all parties, of true versions of the legal provisions at issue in this case.

There is no disagreement among the parties that under Costa Rican law, the limits of a Costa Rican judge's jurisdiction are set forth in article 46 of Costa Rica's Código Procesal Civil ("Code of Civil Procedure," hereinafter, "CCP"). That article provides:

The Costa Rican judge shall have jurisdiction in the following cases:

1) When the defendant, of any nationality, is domiciled in Costa Rica.

2) When the obligation has to be performed in Costa Rica.

3) When the action originates from a fact that occurred or from an act practiced in Costa Rica.

In this case, the defendants are not domiciled in Costa Rica, there is not a question of an obligation (contract) to be performed in Costa Rica, and as alleged by plaintiffs, the action originates from acts undertaken, and decisions made, by the defendant companies at their highest levels in their corporate headquarters in the United States. Accordingly, CCP 46 does not provide a basis for jurisdiction over this claim in Costa Rica. The Court's conclusion on this point is buttressed by a Costa Rican court's finding in a very similar DBCP case that where

... the facts set forth in support of the petition are rooted in the prohibition to prepare the aforesaid chemicals and distribute them, in addition to the fact that the orders to do so originate in the United States of America, there is no doubt that objective criteria prevail and the filing of the complaint in [the USA] was correct, in addition to the fact that

the domicile of the defendants is there, as are their presumptive properties. Consequently, we do not believe that any of the three premises in Article 46 or the two premises in Article 47[11] of the Code of Civil Procedure apply either.

*Aguilar v. Dow Chemical Corp.*, Decision of Judge Javier Viquez Herrera, Second Civil and Labor Court of Limón (May 20, 1996).

Instead, the *Aguilar* court found that the jurisdiction issue in that DBCP case was governed by articles 318 and 323 of the Code Bustamente.[12] *Id.* The Code Bustamente is a treaty of international private law to which Costa Rica is a signatory. Its provisions supplement Costa Rican law where there are gaps, and it actually supersedes Costa Rican law in cases where the two conflict.[13]

Article 318 provides that:

The judge competent in the first place to take cognizance of suits arising from the exercise of civil and commercial actions of all kinds shall be the one to whom the litigants expressly or impliedly submit themselves, provided that one of them at least is a national of the contracting State to which the judge belongs or has his domicile therein, and in the absence of local laws to the contrary.

Article 323 provides:

Outside the cases of express or implied submissions, without prejudice to local laws to the contrary, the judge competent for hearing personal causes shall be the one of the place where the obligation is to be performed, and in the absence thereof the one of the domicile or nationality of the defendants and subsidiarily that of their residence.

Under these articles, one looks first for jurisdiction in the place where the parties have submitted themselves to jurisdiction, although consent alone is not enough to create jurisdiction—there must be some connexity to the contracting state (in this case, Costa Rica). CODE BUSTAMENTE, art. 318. When the parties have not submitted themselves to the courts of a contracting state—that is, **outside the cases of express or implied submissions**—one looks to the place where the obligation (contract) is to be performed (which is not applicable to our case), and in the absence thereof, to the **domicile of the defendants.** *Id.*, art. 323. In this case, plaintiffs have not submitted themselves to the jurisdiction of the Costa Rican courts, and accordingly, jurisdiction lies in the domicile of the defendants—the United States.[14]

Defendants argue however, that this state of affairs is not dispositive of the availability question, because the parties may create concurrent jurisdiction in Costa Rica by merely submitting to the jurisdiction of the Costa Rican courts. And up to a point, this argument is correct—the plain language of article 318 of the Code Bustamente reveals that by their submission, expressly or impliedly, to the jurisdic-

---

11. CCP 47 applies to actions involving property.

12. The translation provided to the Court contains a typographical error by the court or translator, in that the opinion references article 325 rather than 323. However, article 325 applies to real actions in respect to real property, and the *Aguilar* court's discussion of the cited article reveals that it intended to reference article 323.

13. Garro Depo. (Apr. 7, 2002), 55; Deposition of Diego Baudrit ("Baudrit Depo.") (Apr. 5, 2002), 19–20. N.B.: While the transcript of the Baudrit deposition submitted to the Court is dated Friday, April 5, 2001, it is the Court's understanding that the deposition was actually taken on Friday, April 5, 2002.

14. As is discussed more fully *infra*, it is also the case that under our laws, jurisdiction is present in this court.

tion of the Costa Rican courts, jurisdiction over plaintiffs' claims will attach. However, with respect to this particular case, the argument is flawed in two respects—it does not take cognizance of CCPs 122 and 477 (forbidding forced lawsuits) or of CCP 31 (concerning preemptive jurisdiction).

Article 122 provides that "[e]xcept for an action of jactitation, nobody can be forced to sue." Similarly, CCP article 477 provides that "[n]obody can be forced to try to file a lawsuit." These articles reflect the notion that certain juridical acts are only valid when freely and voluntarily undertaken. All of plaintiffs' pleadings, and indeed, the very posture of the instant case, reflect the fact that plaintiffs do not want to proceed in court in Costa Rica. Were this court to dismiss this action conditioned on plaintiffs' refiling it in Costa Rica and having the Costa Rican court accept the case (as was done by the district court in *Delgado*), the Court would be forcing the plaintiffs to try to file the lawsuit in Costa Rica in violation of articles 122 and 477. Without the free consent of plaintiffs to pursue their claims in Costa Rica, valid submission to Costa Rican jurisdiction for purposes of Code Bustamente article 318 is simply not present, and thus cannot serve to create concurrent jurisdiction there.

Finally, the Court considers article 31 of the Costa Rican Code of Civil Procedure, which states that "[i]f there were two or more courts with jurisdiction for one case, it will be tried by the one who heard it first at plaintiff's request." Under this rule, in cases in which there might initially have been concurrent jurisdiction in two or more fora, once a plaintiff has chosen a particular forum, all other possible fora are divested of jurisdiction. Thus, when plaintiffs filed suit against defendants in this Court, by operation of CCP 31, as of that filing, the Costa Rican courts—if they ever had jurisdiction—were divested of jurisdiction in favor of this Court. Because the courts of Costa Rica may no longer assert jurisdiction over plaintiffs' claims, they must be considered unavailable.

What is especially noteworthy about CCP 31 is that it is fatal to defendants' position even if the Court has misconstrued the other Costa Rican articles discussed above. For instance, even if CCP 46 did provide for concurrent jurisdiction in Costa Rica, and even if CCP articles 122 and 477 did not invalidate a forced submission to Costa Rican jurisdiction, because at a very minimum there is concurrent jurisdiction in the United States and plaintiffs filed here first, the jurisdiction of the Costa Rican courts has been preempted. Tellingly, CCP article 31 was not mentioned, nor is its effect discussed at all, by defendants' expert, Diego Baudrit, in his video deposition testimony.[15]

This analysis demonstrates that the plain language of relevant Costa Rican legal provisions supports the interpretation proposed by plaintiffs. Additionally, the expert testimony credited by the Court reaffirms the Court's reading of the law. And, as the following discussion bears out, recent Costa Rican decisions interpreting the articles in the *Abarca* and *Aguilar* cases lend further support to this view.

---

**15.** Likewise, neither CCP article 31, nor the concept of preemptive jurisdiction, is mentioned or discussed in any of the declarations and affidavits submitted by defendants and reviewed by the Court in connection with this motion. *See,* Decl. of Miguel Blanco Quiros (Apr. 5, 1994), Rec. Doc. 121, Exh. A (behind "Costa Rica" tab); Aff. of Oscar Bejarano Coto (July 4, 1994), Rec. Doc. 121, Exh. P; Decl. of Diego Baudrit (July 28, 2001), Rec. Doc. 131, Exh. D–5; Decl. of Miguel Blanco Quiros (Apr. 18, 1996), Rec. Doc. 131, Exh. D–6; Decl. of Ricardo Vargas Hidalgo (Apr. 18, 1996), Rec. Doc. 131, Exh. D–7.

## The Delgado/Abarca case

*Abarca* began its odyssey in the Courts of the western hemisphere in the Southern District of Texas, styled as *Delgado v. Shell Oil Co.*, 890 F.Supp. 1324 (S.D.Tex. 1995) and involving facts very similar to those in the instant case. The district court judge in *Delgado* dismissed that case on forum non conveniens grounds, finding that plaintiffs' home fora were both available and adequate, and concluding that the private and public interest factors weighed in favor of dismissal. The Court also considered the argument that plaintiffs strenuously make here—that because they initially elected to file suit in the United States, a Costa Rican court would not take jurisdiction of the case—and conditioned the dismissal on the ability of plaintiffs to proceed in their home courts. The *Delgado* opinion provided that plaintiffs were permitted to reinstate their claim in the Southern District of Texas if there was a legal impediment to their proceeding in Costa Rica.

As it happens, that is exactly what did occur. Following their dismissal in the Southern District of Texas, plaintiffs re-filed suit in Costa Rica, in a suit styled *Abarca v. Dow Chem. Co.* Their pleading contained the procedural history of the case, and based upon plaintiffs' initial election of the U.S. forum, the Costa Rican court dismissed the case *sua sponte* for lack of jurisdiction, before defendants were served. Plaintiffs' appeal from the dismissal was ultimately confirmed by the highest court in Costa Rica, which noted the technical defect of the first appeal due to the fact that plaintiffs were not, strictly speaking, aggrieved parties, because while their Costa Rican suit had been dismissed, it was clear from the procedural history that that was precisely the result plaintiffs desired. Having obtained a final order from the highest court in Costa Rica that the Costa Rican courts lacked jurisdiction, the *Delgado* plaintiffs filed a Motion for Reinstatement in the Southern District of Texas. That motion remains pending.

## The Aguilar (Limón) case

Moreover, the *Abarca* dismissal is not isolated. In a similar and possibly related case, the Second Civil and Labor Court of Limón likewise dismissed a DBCP claim case brought by David Austin Aguilar. Making reference to the district court's decision in *Delgado,* the Limón court expressly found that because Costa Rican courts do not recognize forum non conveniens, and plaintiff's claims were properly brought in the United States in the first instance, it was not competent to hear the case. Opinion, Second Civil and Labor Court of Limón, May 20, 1996.

In the face of this record—statutory provisions whose plain language supports plaintiffs' view, and recent case law interpreting those statutes in the manner advocated by plaintiffs, defendants have offered the countervailing expert testimony of Diego Baudrit, and two main arguments. They are: (1) to so hold requires the Court to reach the absurd result that a case first-filed in the United States can never be transferred for forum non conveniens to a civilian jurisdiction without the whole-hearted, unreserved consent of the plaintiff; and (2) tiny Costa Rica, by clinging to its archaic, Justinian civilian principles, should not be allowed to dictate to United States judges which cases they have to hear.

## Relative Weight of Baudrit Testimony

With respect to Baudrit's testimony, the Court finds that it is flawed in two respects. First, his analysis does not even mention Code of Civil Procedure article 31, which is directly on point and fatal to defendants' position. Second, the record reveals that Baudrit's credibility is subject to question, given his admission that he has represented defendant Dole in DBCP

matters for 12 years, and continues to do so presently.[16] In fact, Baudrit admitted that the opinions he expressed on the legal issues in this case were formed while representing Dole in another DBCP case (*Abarca, supra*). As another court has noted, Baudrit's dual role as expert and counsel for defendant Dole is problematic, and calls into question whether his testimony is competent to carry defendants' burden of persuasion. *In re Bridgestone/Firestone, Inc.*, 190 F.Supp.2d 1125, 1131–1132 (S.D.Ind.2002). In fact, the *Firestone* court suggested that this type of conflict could make a purported expert's testimony "virtually useless." *Id.* at 1135 n. 5. Finally, the Court had the opportunity to view the video perpetuation depositions of both Baudrit and Garro during the court hearing on this motion, and simply found Garro's demeanor and testimony more credible. Given these facts, the Court naturally accords Baudrit's testimony less weight.

### The Clash of Civilian and Common Law Traditions

With respect to defendants' argument regarding the alleged absurdity of an interpretation which permits Costa Rican law to "trump" the law of forum non conveniens, the Court notes that defendants are not the first to be confronted with this conundrum; this precise issue has been the subject of legal commentary for years and an obstacle for those attempting to draft international treaties governing the recognition of international judgments. *See, e.g.,* Martine Stuckelberg, *Lis Pendens and Forum Non Conveniens at the Hague Conference,* 26 BROOK. J. INT'L L. 949 (2001). The discord stems from the fact that as a general rule, civilian legal systems (such as Costa Rica's) simply do not recognize the doctrine of forum non conveniens. *See, e.g.,* Konstantinos D. Kerameus, *A Civilian Lawyer Looks at*

*Common Law Procedure,* 47 LA. L.REV. 496–97 (Jan.1987) ("The doctrine of forum non conveniens is not part of the civilian tradition."); Alan Reed, *To Be or Not to Be: The Forum Non Conveniens Performance Acted Out on Anglo–American Courtroom Stages,* 29 GA. J. INT'L & COMP. L. 31, 126 at n. 27 (Fall 2000) ("[F]orum non conveniens is anathema to civilian lawyers.") (Other citations omitted).

The civilians' rejection of forum non conveniens reflects a legal tradition which places "a very high premium on certainty and predictability in general and particularly as to adjudicatory jurisdiction." Stephen B. Burbank, *Jurisdictional Equilibrium, the Proposed Hague Convention, and Progress in International Law,* 49 AM. J. COMP. L. 203, 216 (Spring 2001). Further, the civilian tradition "only grudgingly admits a role for judicial discretion, if it admits any such role at all. Both are reasons not to give a court vested with jurisdiction discretionary power to decline to exercise that jurisdiction, and they help to explain why the forum non conveniens doctrine is rejected in most of the civil law world and in the Brussels Convention." *Id.* Thus, to the civilian mind, it is unthinkable that a court vested with jurisdiction could, in its own discretion, decline to exercise that jurisdiction for reasons of mere convenience, in the process sacrificing certainty as to the forum (which is up for grabs as soon as forum non conveniens comes into play) and predictability of result (inevitable when the decision is left to individual judges on a case-by-case basis). The civilian approach, while different than ours, does have its advantages: it can substantially reduce the time and cost of litigation by foreclosing lengthy and expensive contests over where a case will be heard, even after the appropriateness of a

---

**16.** Baudrit Depo., Part 2 (Apr. 5, 2002), 47–    48; 71–72.

particular jurisdiction has been established.[17]

However, while the facts of the instant case highlight differences between civilian and common law attitudes, it should also be borne in mind that this case does not present a true conflict of laws. A true conflict between domestic and foreign law exists when compliance with the laws of both countries is impossible. *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 799, 113 S.Ct. 2891, 2910–11, 125 L.Ed.2d 612 (1993) (addressing issue of whether a court with Sherman Act jurisdiction should ever decline to exercise such jurisdiction on grounds of international comity). In this case, to accord the deference to Costa Rican law which is due under principles of comity—and apply the plain language of article 31 of the Costa Rican Code of Civil Procedure—does not require the Court to do violence to U.S. laws or to countenance acts prohibited by U.S. laws. To the contrary, application of U.S. forum non conveniens law presupposes the availability of at least two fora; Costa Rica's laws render its courts unavailable as a forum in the circumstances presented here. Accordingly, to deny defendants' forum non conveniens motion does not work an absurd result—rather, it is the logical result of the terms of the forum non conveniens doctrine as set forth by the Supreme Court and the unique facts of this case—not that Costa Rican law is unfairly "trumping" U.S. law in a true conflict.

Implied in defendants' argument that Costa Rican law should not be able to dictate to American judges what cases they must hear, is the notion that it is simply unfair that Costa Rica can take a position that undercuts American forum non conveniens law, and thus "dictate"

what cases they must hear. However, it should be emphasized that this Court could never reach the forum non conveniens issue if it had not first been established that it is fundamentally fair for this action to proceed in this Court. While "the central focus of the forum non conveniens inquiry is convenience," *Piper Aircraft Co. v. Reyno*, 454 U.S. at 249, 102 S.Ct. at 262, jurisdiction is premised on considerations of fair play and substantial justice. *International Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (citations omitted). The direct defendants are all U.S. corporations. The parties do not dispute that jurisdiction in this Court is proper. Thus, the fact that the Court is even entertaining the forum non conveniens motion means that under the laws of the United States, it is fundamentally fair and substantially just for defendants to be haled into court here.

The Court also finds distinguishable those cases cited by defendants' in their Supplemental Memorandum as support for the argument that "myriad controlling Fifth Circuit opinions" dictate that there should never be a bar to forum non conveniens dismissal in favor of a civil law jurisdiction, and finds them distinguishable.[18] Not one of the cases cited presented a factual scenario in which the record included a statute from the proposed alternative forum indicating that prevailing law and the unique circumstances of the case prevented the foreign forum from asserting jurisdiction. To the contrary, some of the cases cited involved situations in which the availability of a foreign forum was not in dispute. For instance, in *Seguros Comercial America S.A. de C.V. v. American*

---

17. The twenty-year forum non conveniens struggle in connection with DBCP litigation illustrates the advantages of the civilian approach.

18. *See*, Rec. Doc. 143, Defendants' Supplemental Memo, 4 at n. 2.

*President Lines, Ltd.,* 105 F.3d 198 (5th Cir.1996), the Fifth Circuit approved a foreign non conveniens dismissal in which the district court specifically found that "neither party dispute[d] the ability of a Mexican court to exercise jurisdiction over Seguros' claims against APL. . . ." *Seguros Comercial Americas, S.A. de C.V. v. American President Lines, Ltd.,* 910 F.Supp. 1235, 1245 at n. 22 (S.D.Tex.1995), *vacated on other grounds,* 105 F.3d 198. *See also, Camejo v. Ocean Drilling & Exploration,* 838 F.2d 1374, (5th Cir.1988). In others, the bar to foreign jurisdiction was the defendants' lack of amenability to process, and the cases were conditionally dismissed contingent upon defendants' stipulation that they would submit to personal jurisdiction. For instance, in *Alpine View,* the court, emphasizing that "a foreign forum is available when the entire case and all parties can come within the jurisdiction of that forum," upheld the trial court's conclusion that because all of the defendants agreed to submit to the jurisdiction of either Swedish or Norwegian courts, and to have either Swedish or Norwegian law apply to their suit between the parties, Norway was available as an alternative forum. *Alpine View,* 205 F.3d at 221. Reviewing the district court under an abuse of discretion standard, the Fifth Circuit found that based on the facts of that case "and other evidence contained in the record, the [district] court **could conclude** that Norway presented an adequate forum." *Id.* (emphasis added). However, it simply does not follow from this record that had the court been presented with a different record, which included evidence that under the prevailing law in the proposed alternative forum, jurisdiction in that forum was forever preempted because of the plaintiff's initial forum selection, that the court would still find that a foreign forum was available. Thus, the Court

finds that the cases pointed to by defendants are inapposite to the precise issue before the Court, and while they do indicate that forum non dismissals in favor of civilian jurisdictions have been found to not be an abuse of discretion, they do not dictate that result here.

### Is Forum–Shopping Reprobated?

As a final point in relation to the discussion of the unavailability of Costa Rica as a forum for this case, the Court also addresses the suggestion by defendants that the Abarca dismissal should not figure in this Court's analysis because the *Abarca* dismissal was somehow underhandedly achieved because the plaintiffs, in their pleadings, took pains to apprise the Costa Rican court of their preference for a U.S. forum and the procedural history of the case, inviting the Costa Rican court to dismiss the action sua sponte based upon the provisions of the Costa Rican Code of Civil Procedure cited above.

In response, the Court first observes that even defendants' expert acknowledged that the Abarca plaintiffs were bound to truthfully disclose the procedural history of the case when it was presented to the Costa Rican court,[19] and based on that history and the law of Costa Rica as this Court perceives it, dismissal was required. As for the suggestion that the *Abarca* decision was tainted because plaintiffs' actually desired the dismissal, the Court disagrees, but notes that this view is consistent with defendants' arguments and pleadings filed in this case, which are permeated with the insinuation that plaintiffs' efforts to secure a U.S. forum (like the *Abarca* plaintiffs' desire for dismissal from the Costa Rican courts), reveal that they are shamefully exploiting procedural technicalities in an exercise of rank forum-shopping, which the Court should frown upon. In essence, defendants suggest that

19. Baudrit Depo. (Apr. 5, 2002), 49–50.

there is something untoward in plaintiffs seeking access to whatever available forum will be most advantageous for them.

Judge Alvin Rubin cogently pointed out the weakness in this viewpoint in *McCuin v. Texas Power & Light Co.*, 714 F.2d 1255 (5th Cir.1983). While the excerpt below is rather lengthy to import here, the Court does so because the analysis is so apt to present circumstances and so well-stated:

> **Forum-shopping is sanctioned by our judicial system. It is as American as the Constitution,** peremptory challenges to jurors, and our dual system of state and federal courts. The extension in Article III of federal judicial power to "controversies between citizens of different states," implemented by statute continuously since 1789, permits a plaintiff who might sue in a state court to select a federal forum for the claim. The statutory provision for removal to federal courts of such diversity cases filed in state court permits the defendant to opt for a federal forum.[20] Virtually all causes of action created by federal law may be asserted in either a state or a federal court. Many claims that may be asserted in the courts of one state may also be asserted in the courts of another. Not only may a litigant frequently select among several jurisdictions, he may, within a jurisdiction, lay venue in more than one court.
>
> The existence of these choices **not only permits but indeed invites counsel in an adversary system, seeking to serve his client's interests, to select the forum that he considers most receptive to his cause.** The motive of the suitor in making this choice is ordinarily of no moment: a court may be selected because its docket moves rapidly, its discovery procedures are liberal, its jurors are generous, the rules of law applied are more favorable, or the judge who presides in that forum is thought more likely to rule in the litigant's favor.
>
> . . . .
>
> In a perfect judicial system forum-shopping would be paradoxical. The same results would obtain in every forum and after every type of trial. But the actual litigation process is not a laboratory in which the same result is obtained after every test. In some situations, such as when a statute of limitations is involved, the choice of forum may determine the rule of law that will be applied. Even when legal rules are identical, justice can be obtained only through human beings, and neither judges nor jurors are fungible. **In recognition both of this and of the nature of the adversary, client-serving process, we tolerate a certain amount of manipulation** without inquiry into motive.

*Id.* at 1261–62 (internal citations and footnotes omitted); (emphasis added).

Thus, despite defendants' insinuation that plaintiffs' effort to secure the most favorable forum is somehow unscrupulous or unsporting, the Court finds instead that it is consistent with the usual workings of our adversary system.[21]

To succeed on their motion to dismiss, defendants are required to meet their burden of persuasion by producing "unequivocal, substantiated evidence" for their posi-

---

**20.** The removal mechanism was employed by defendants in their own exercise in rank forum-shopping when they third-partied Dead Sea Bromine Co. in an effort to secure federal jurisdiction based on 28 U.S.C. §§ 1602–1611. Dead Sea cooperated by waiving its sovereign immunity.

**21.** Likewise, the instant motion, in which defendants argue that it would be more convenient for U.S.-based companies to defend multiple, parallel suits in a handful of foreign countries, based on claims arising from actions undertaken in the United States, is equally consistent with our adversary system.

tion. *Baris v. Sulpicio Lines, Inc.*, 932 F.2d 1540, 1550 n. 14 (5th Cir.1991). However, on the question of the availability of Costa Rica as a forum, in the face of the plain language of article 31 of the Costa Rican Code of Civil Procedure and case law which demonstrates that Costa Rica is **not** available as an alternative forum, defendants rely solely on the testimony of an expert who has been employed as an attorney for Dole in DBCP cases for 13 years, and whose testimony does not even address article 31. "A forum non conveniens dismissal should never be granted ... unless the defendant can satisfy the court that an adequate and available forum exists." *Perusahaan Umum Listrik Negara Pusat v. M/V Tel Aviv*, 711 F.2d 1231, 1238 (5th Cir.1983). In this case, defendants have simply failed to convince the court that an available alternative forum exists.

### Adequacy of Costa Rican courts

While practically speaking, the Court's conclusion that Costa Rica is unavailable as an alternative forum for plaintiffs' claims is dispositive of the forum non conveniens inquiry with respect to that country, in the interest of thoroughness, the Court also addresses the adequacy requirement.

As noted above, "A foreign forum is adequate when the parties will not be deprived of all remedies or treated unfairly, even though they may not enjoy the same benefits as they might receive in an American court." 821 F.2d 1147, 1165 (5th Cir. 1987) (citations omitted). On the question of the adequacy of Costa Rican courts as a forum for plaintiffs' claims, plaintiffs' expert acknowledged that the Costa Rican courts do in fact provide a remedy for an injured banana worker, and that "moral damages," (which equates to general damages in this country) are available for plaintiffs' claims. *Id.* at 1179–80. However, he also opined that the gap between the law as written and the law in practice in Latin America meant that despite law on the books that would provide a remedy for plaintiffs, the relief available was not meaningful and therefore the Costa Rican courts were an inadequate forum.[22] Garro also expressed reservations about the ability of the Costa Rican courts to expeditiously handle large, multi-party suits, and criticized the breadth of discovery practice in comparison to the United States.[23]

As discussed above in connection with defendants' Motion to Strike, Garro's consideration of the essential "meaningfulness" of available remedies or relief is not entirely misplaced, because in the Fifth Circuit, courts are instructed to consider whether an alternative legal system would treat litigants unfairly. *See In re Air Crash Disaster Near New Orleans, La.*, 821 F.2d 1147, 1165 (5th Cir.1987). However, the Court's research into the condition of the Costa Rican judicial system belies plaintiffs' claims that available remedies are not meaningful. The United States Department of State, in analyzing human rights practices in Costa Rica, has concluded that "The Constitution and law [of Costa Rica] provide for an independent judiciary, and the Government generally respects this provision **in practice.** The Constitution provides for the right to a fair trial, and an independent judiciary vigorously enforces this right." U.S. Dept. of State, Country Report on Human Rights Practices, Costa Rica, 2001 (released Mar. 4, 2002) (emphasis added).[24] Further, as

---

**22.** *See, e.g.*, Garro Depo. (Apr. 7, 2002), 50–52.

**23.** *Id.* at 47–52.

**24.** The report may be found at *http://www.state.gov/g/drl/* rls/hrrpt/2001. The Court may take judicial notice of the nature of a foreign judicial system on a motion to dismiss on grounds of forum non conveniens. *See,*

Garro himself admits, Costa Rica has one of the more independent, advanced judicial systems in Latin America.[25] And, while the Costa Rican courts' capacity to deal with multi-party litigation and discovery procedures might not be on a par with the United States, it is well-settled that simply because a foreign system does not provide the same benefits as the American system it is not considered inadequate. *McLennan*, 245 F.3d at 424.

Accordingly, the Court concludes that **if it were otherwise available,** Costa Rica would provide an adequate forum for plaintiffs' claims.

### Honduras

#### Availability

■■■ Counsel for both sides of this dispute have provided the Court with little guidance on the question of the availability of Honduran courts as an alternative forum for plaintiffs' claims. Plaintiffs argue essentially that Honduran law authorizes suits in a defendant's domicile, and that a preemptive jurisdiction rule favoring a plaintiff's first choice of forum (as in the case of Costa Rica), dictates that Honduran courts would not be able to assume jurisdiction over plaintiffs' claims because their initial filing here divested the Honduran courts of jurisdiction.[26]

Defendants' main argument on this point is that Honduras must be an available, alternative forum because the *Delgado* court previously found it so, and "Honduran courts have repeatedly accepted jurisdiction in DBCP cases."[27] Finally, defendants claim that previously dismissed *Delgado* claimants have successfully brought actions in Honduras, and refer the court to a 1994 Honduran case, *Zelaya Melendez v. Standard Fruit de Honduras S.A.*, in which Honduran courts allegedly upheld the rights of workers to recover compensation for DBCP-related injuries.[28]

The brevity of both sides' arguments on the Honduran question may be explained by the fact that the analysis for Honduras is the same as that for Costa Rica, as plaintiffs' expert testified.[29] Indeed, a review of Honduran law indicates that the preemptive jurisdiction rule embodied in Honduran law is possibly even more categorical than its Costa Rican counterpart.

At the outset, it should be observed that Honduran law provides a basis for jurisdiction in the defendants' domicile: "The Judge with jurisdiction in lawsuits con-

---

e.g., *Murty v. Aga Khan*, 92 F.R.D. 478 (E.D.N.Y.1981). Likewise, the Court is authorized to take judicial notice of official government publications. *Austracan (U.S.A.) Inc. v. Neptune Orient Lines, Ltd.*, 612 F.Supp. 578 (S.D.N.Y.1985) (Government-published shipper's guide); *Nehus v. Alaska Marine Towing, Inc.*, 519 F.Supp. 328 (W.D.Wash.1981) (United States Pilot publication); *Asg Industries, Inc. v. U.S.*, 82 Cust.Ct. 1, 467 F.Supp. 1187 (Cust.Ct.1979) (U.S. Dept. of Commerce report). Finally, State Department Country Reports concerning the fairness of a foreign country's judicial system are not excludable as hearsay; they are admissible as "reports ... of public ... agencies setting forth ... matters observed pursuant to duty imposed by law as to which matters there was a duty to report ... unless ... circumstances indicate lack of trustworthiness." FED. R. EV. 803(8).

See also *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 142 (2nd Cir.2000) (holding State Department Country Report on fairness of Liberian judicial system admissible).

**25.** Garro Depo. (Apr. 7, 2002), 137.

**26.** *See*, Rec. Doc. 127, Plaintiffs' Memo in Opp., 16 (citing Aff. of Alejandro Garro (Dec. 3, 2001), Exh. 26, ¶¶ 36–39).

**27.** Defendants' Memo in Support, 14, and Reply Memo, 12 (citing Aff. Of Cesar Batres, Rec. Doc. 131, Exh. D–13, ¶ 4) (other citations omitted).

**28.** Defendants' Memo in Support, 14. The Court was unable to locate the cited case.

**29.** Garro Depo. (Apr. 7, 2002), 43–44.

cerning personal actions shall be the one of the place where the obligations must be performed, and if this did not exist, at plaintiff's choice, the one of defendant's domicile or the one of the place of the contract, if while the defendant is in such place, even accidentally, summons can be served." LEY DE ORGANIZACIÓN Y ATRIBUCIONES DE LOS TRIBUNALES (LAW ON THE ORGANIZATION AND POWERS OF COURTS) art. 146(1).[30] But because Honduras is also a signatory to the Code Bustamente, the Court must consider the possibility that notwithstanding the legal basis for jurisdiction in the defendants' domicile, concurrent jurisdiction in Honduras could be established by the submission of the parties. *See,* CODE BUSTAMENTE, article 318. However, as in Costa Rica, if this submission were made solely due to an order of the Court, and without the free consent of plaintiffs, it would be invalid as a basis for creating jurisdiction. The Honduran Congress has opined on the invalidity of such an act, noting that when "[t]he plaintiff is compelled to resort to a national court [by the order of a foreign court] and although he can file a claim that is formally valid, such claim cannot generate jurisdiction in the country because a spontaneous and an authentic will is lacking." Congress of Honduras, Resolution in the Defense of Legislative Sovereignty, Judicial Independence and Procedural Rights, ¶ 7 (May, 7, 1996).[31]

In further parallel to the situation in Costa Rica, the presence of concurrent jurisdiction in the United States and Honduras is unavailing to the defendants' position, because plaintiffs' choice to sue in defendants' domicile forecloses the option to sue elsewhere. "Once the lawsuit has been filed before a Judge or Court with jurisdiction, such jurisdiction cannot be altered by a supervening event." LEY DE ORGANIZACIÓN Y ATRIBUCIONES DE LOS TRIBUNALES, art. 138. Further, "[w]hen according to the law there are two or more Judges or Courts with jurisdiction over the same case, neither of them can decline presiding over the case under the pretext that there are other Judges or Courts that can decide the same matter; but the one who has heard the case before, excludes the others, who lost jurisdiction as from that moment." *Id.,* art. 141.

Moreover, in contrast to Costa Rica, in Honduras, the filing of a foreign lawsuit on the same subject matter does create lis pendens: "[T]he following is admissible as [a] dilatory exception[ ]: 4. Lis pendens before a Court with jurisdiction." CODIGO DE PROCEDIMIENTOS (Code of Civil Procedure), art. 286(4).

In addition to the preemptive jurisdiction problem posed by the enactments cited above, Honduras may be foreclosed as an available forum because the Honduran claimants may be time-barred by a one-year statute of limitations contained in the Labor Code.[32] While the Court recognizes that Valeriano's affidavit does not address whether the statute of limitations is waivable, no evidence to resolve that question

**30.** *See also,* Official Opinion of the Attorney General's Office of the Republic of Honduras (June 2, 1995) ("... the first rule of article 146 of the Law on the Organization and Attributes of the Courts, which has been in force since 1906, provides that in personal actions, the court of the place where an obligation is to be honored shall be competent, otherwise, at the election of the plaintiff, a judge of the defendant's domicile"). Plaintiffs' Memo in Opp., Exh. 48 at 14 n.xxxv.

**31.** This document may be found at Rec. Doc. 127, Plaintiffs' Memo in Opp., Exh. 48 at 15 n.xxxvii.

**32.** Aff. Of Enrique Flores Valeriano, ¶ 20 (citing article 453 of the Honduran Labor Code), found at Rec. Doc. 127, Plaintiffs' Memo in Opp., Exh. 51.

has been brought forward by the defendants, who bear the burden of persuasion. Accordingly, Valeriano's uncontroverted affidavit provides another basis for concluding that defendants have failed to demonstrate that Honduras is available as an alternative forum.

With respect to defendants' argument in reliance on the expert testimony of Cesar Batres, that Honduran courts have entertained several DBCP cases, the Court notes that the testimony, while it may be true as far as it goes, simply does not address the points critical to this Court's finding. The substance of Batres' affidavit is as follows:

> The Honduran civil courts clearly have jurisdiction over DBCP cases. Several DBCP cases have been filed in the Honduran courts, and the Honduran courts have exercised jurisdiction over those cases. Although those above mentioned cases have since been dismissed, it has not been for lack of jurisdiction, but instead because the plaintiffs failed for three years to prosecute them and the Court consecuently (sic) declared the expiration of the actions.[33]

The Court does not doubt that there are situations in which Honduran courts would assume jurisdiction over DBCP cases, especially when they were first filed in Honduras and/or when there is no lis pendens exception applicable. However, what is strikingly absent from Batres' averment is any suggestion that the Honduran courts would accept jurisdiction over cases first-filed somewhere else, as has occurred here, or any discussion or mention of the preemptive jurisdiction and lis pendens provisions of Honduran law.[34]

Accordingly, the Court finds that defendants have failed to meet their burden of persuasion requiring them to convince the Court that Honduras is an available alternative forum.

### Adequacy

In addition to the fact of its unavailability as an alternative forum, and in contrast to Costa Rica, Honduras appears to be inadequate as a forum for plaintiffs' claims.

According to the United States Department of State, "the [Honduran] Constitution provides for an independent judiciary; however, the judiciary is poorly staffed and equipped, often ineffective, and subject to outside influence. While the Government respects constitutional provisions in principle, implementation has been weak and uneven in practice." U.S. Dept. of State, Country Report on Human Rights Practices, Honduras, 2001 (released Mar. 4, 2002), 7.[35] The State Department goes on to identify factors which limit the effectiveness of the Honduran system. Specifically, "[b]oth the judiciary and the Public Ministry suffer from inadequate funding; low wages and lack of internal controls make law enforcement officials susceptible to bribery; the civil law inquisitorial system is both inefficient and opaque; and powerful special interests still exercise influence and often prevail in the courts." *Id.* Indeed, "[a]pproximately 35 percent of the complaints received by the National Human Rights Commission concern the judicial system." *Id.* This assessment conforms with the opinion of expert Alejandro Garro, who compared Honduras' court system unfavorably with that of Costa Rica, commenting upon the enormous problems experienced there.[36]

---

**33.** Aff. Of Cesar A. Batres (Dec. 27, 2001), found at Rec. Doc. 131, Defendants' Reply, Exh. D–13, ¶ 4.

**34.** Likewise, the court has no way to know where the 1994 Honduran case referred to by

defendants, *Zelaya Melendez v. Standard Fruit de Honduras S.A.*, was first filed.

**35.** The report may be found at *http://www.state.gov/g/drl/rls/* hrrpt/2001.

**36.** Garro Depo. (Apr. 7, 2002), 149–150.

The problems identified by the State Department are not in the nature of those shortcomings referred to in case law holding that simply because a foreign system does not provide the same benefits as the American system it should not be considered inadequate. Rather, they are fundamental defects that indicate a high likelihood that plaintiffs will be treated unfairly, especially given that defendants may well be the type of "powerful special interests" that "exercise influence and often prevail in the courts."

Under these facts, the Court finds that defendants cannot meet their burden of demonstrating that plaintiffs "will not be deprived of all remedies or treated unfairly," and accordingly, the Court finds that Honduras is both unavailable and inadequate as a forum for plaintiffs' claims. *In Re Air Crash Disaster Near New Orleans, La.*, 821 F.2d at 1165.

### Philippines

#### Availability

■ On the question of the availability of an adequate forum in the Philippines, plaintiffs contend that the laws of that country also divest its courts of jurisdiction when a plaintiff has elected to first file a case somewhere else. In addition to the alleged preemptive jurisdiction problem, plaintiffs' also allege that no Philippine forum is available because their claims will have prescribed. In support of these arguments plaintiffs point the Court to affidavits of their expert, Hildegardo F. Inigo, provisions of Philippine law, and cases interpreting it.

Defendants argue that claims first filed in foreign jurisdictions may be subsequently filed in the Philippines, and point the Court to the fact that certain "re-filings" of *Delgado* dismissals are currently pending in Philippine courts. They also contend that any prescription problems can and will be waived. In support of these arguments they have provided the affidavit testimony of their expert, Augusto San Pedro.

Philippine law contains the following provision in its Rules of Court governing procedure in regional trial courts:

The plaintiff or principal party shall certify under oath in the complaint or other initiatory pleading asserting a claim for relief, or in a sworn certification annexed thereto and simultaneously filed therewith: (a) that he has not theretofore commenced any action or filed any claim involving the same issues in any court, tribunal or quasi-judicial agency and, to the best of his knowledge, no such other action or claim is pending therein; (b) if there is such other pending action or claim, a complete statement of the present status thereof; and (c) if he should thereafter learn that the same or similar action or claim has been filed or is pending, he shall report that fact within five (5) days therefrom to the court wherein his aforesaid complaint or initiatory pleading has been filed.

Failure to comply with the foregoing requirements shall not be curable by mere amendment of the complaint or other initiatory pleading but shall be cause for the dismissal of the case without prejudice, unless otherwise provided, upon motion and after hearing. The submission of a false certification or non-compliance with any of the undertakings therein shall constitute indirect contempt of court, without prejudice to the corresponding administrative and criminal actions. If the acts of the party or his counsel clearly constitute willful and deliberate forum shopping, the same shall be ground for summary dismissal with prejudice and shall constitute direct contempt, as well as a cause for administrative sanctions.

Rules of Court, Civil Actions, Proceedings in Regional Trial Courts, Rule 7, § 5 (Apr. 8, 1997).

Plaintiffs' expert suggests that the import of the above provision is that an action may not be maintained in Philippine regional trial courts when it has been previously addressed to another forum.[37] This interpretation is consistent with the law as stated by the Attorney General of the Philippines, who has opined that "[u]nder Philippine law, where courts have concurrent jurisdiction, the court first taking cognizance acquires jurisdiction to the exclusion of all other courts, foreign or domestic." Amicus Brief of the Republic of Philippines, 15.[38] Likewise, the Philippine Supreme Court has held that "[e]ven in cases of concurrent jurisdiction, it is also axiomatic that the court first acquiring jurisdiction excludes the other courts." *Id.,* citing *Laquian v. Baltazar,* 31 SCRA 552 (1970).

Based on this evidence, it appears to this Court that there is indeed a preemptive jurisdiction bar to plaintiffs filing suit in the Philippines on the claims herein, since they were first filed here. Moreover, the Court is unpersuaded by defendants' counter-argument that because there are re-filed cases brought by plaintiffs dismissed in the *Delgado* case currently proceeding in the Philippine court system, there is no preemptive jurisdiction problem. While three cases were apparently refiled there, they have been pending for nearly six years without the court addressing the jurisdiction issue or setting a trial date. Two cases have been dismissed sua sponte for lack of jurisdiction.[39] Accordingly, there is simply no record evidence for the proposition that the Philippine courts will ultimately exercise jurisdiction over the cases (and the length of, time the cases have been pending without resolution of this threshold question does not bode well for the adequacy of those courts either).

The Court also finds that defendants have not met their burden of demonstrating availability in connection with the prescription hurdle that plaintiffs will face if this action is dismissed and re-filed in the Philippines. Under Philippine law:

> Defenses and objections not pleaded either in a motion to dismiss or in the answer are deemed waived. However, when it appears from the pleadings or the evidence on record that the court has no jurisdiction over the subject matter, that there is another action pending between the same parties for the same cause, or that the action is barred by a prior judgment **or by statute of limitations,** the court **shall dismiss** the claim.

Rules of Court, Civil Actions, Proceedings in Regional Trial Courts, Rule 9, § 1 (Apr. 8, 1997) (emphasis added).

A "plain language" reading of the above provision suggests that a limitations defense is not waivable, because when a time bar is apparent on the face of the pleadings or record evidence, a court **shall dismiss** the claims. This interpretation is supported by the court's decision in *Singzon–Aquirre v. Sulpicio Lines, Inc.* Civil Case No. 7277, Regional Trial Court, 8th Judicial Region, Branch 28 (Catbalogan, Samar, Mar. 28, 2001).[40] *Singzon* involved a contract claim brought 13 years after the contract was confected; under Philippine law, such claims are required to be

---

**37.** *See,* Aff. of Hildegardo F. Inigo, ¶ 5, found at Rec. Doc. 127, Plaintiffs' Memo in Opp., Exh. 27.

**38.** This document may be found at Rec. Doc. 127, Exh. 42.

**39.** Aff. of Augusto San Pedro, Jr. (Jan. 2, 2002), ¶ 7, found at Rec. Doc. 131, Defendants' Reply, Exh. D–14.

**40.** This case may be found in the record at Rec. Doc. 127, Exh. 53.

brought within ten years. In their pleadings, plaintiffs informed the court that the defendants had waived prescription. The court found that Rule 9 required it to dismiss the claim as time-barred, and specifically held that the waiver of prescription was "non-availing since the new [1997] provision of Rule 9 is mandatory in nature as can be seen from the use of the word 'shall' in the provision." *Id.* at 2.

Defendants argue that this Court should not rely upon the *Singzon* case, because it is the ruling of a trial court and therefore has no precedential value.[41] While that may be true as far as it goes—that is, that the *Singzon* opinion is not controlling law in the Philippines—it does not negate the fact that it has persuasive value for this Court as a demonstration of how Philippine courts would interpret Rule 9. Thus, because the plain language of Rule 9 indicates that the claims of plaintiffs herein would be dismissed as time-barred if subsequently re-filed in the Philippines, and the only Philippine court opinion brought to this Court's attention supports that result based on a plain language reading of the rule that comports with the Court's own, the Court finds for this reason as well that defendants have failed to demonstrate that the Philippine courts are available to plaintiffs to adjudicate the claims brought in the present case.

### Adequacy

The Court has already alluded to its reservations about the adequacy of the Philippines as an alternative forum, due to the fact that three re-filed *Delgado* claims have been pending there for six years without jurisdiction having been examined or a trial date set. As it turns out, the inordinate delays in the Philippine system are well-documented and even worse, the delays do not represent the worst faults of the system.

According to the United States Department of State, in the Philippines, "[t]he Constitution provides for an independent judiciary; however, the judicial system suffers from corruption and inefficiency. Personal ties undermine the commitment of some government employees to ensuring due process and equal justice, resulting in impunity for wealthy and influential offenders." U.S. Dept. of State, Country Report on Human Rights Practices, Philippines, 2001 (released Mar. 4, 2002), 5.[42] "Judges and prosecutors are poorly paid, overburdened, remain susceptible to corruption and the influence of the wealthy and powerful, and often failed to provide due process and equal justice. The courts [are] hindered by backlogs, limited resources, and a shortage of judges. Long delays in trials [are] common." *Id.* at 1. "Legal experts inside and outside the justice system criticize personal and professional relationships between some judges and individual or corporate litigants. Some lawyers act as 'case fixers,' gaining the favor of judges and other court officials and allegedly bribing some witnesses." *Id.* at 6.

The content of the State Department's report on the Philippines convinces the Court that defendants cannot carry their burden of demonstrating that the Philippines provides an adequate forum in which "the parties will not be deprived of all remedies or treated unfairly." *In Re Air Crash Disaster Near New Orleans, La.,* 821 F.2d at 1165. To the contrary, given the situation in the Philippine court system, it appears that there is a very real risk that plaintiffs will be denied basic fairness in the prosecution of their claims. This Court is especially disturbed by the

---

41. *See,* Aff. of Augusto San Pedro, Rec. Doc. 131, Defendants' Reply, Exh. D–14.

42. The report may be found at *http://www.state.gov/g/drl/rls/* hrrpt/2001.

reports of improper relationships between the Philippine courts and corporate litigants, given that the defendants in this case surely represent some of the most powerful corporations doing business in the Philippines.[43] To the extent that "justice delayed is justice denied," it also seems likely that justice is not possible in the Philippines—plaintiffs' expert testified that their case could take 15 years to wind its way through the court system, and that is consistent with the evidence in this case that in six years, no trial date has been set for the re-filing *Delgado* plaintiffs.

Accordingly, on the record and evidence before the Court, the Philippines is neither available nor adequate as an alternative forum for plaintiffs' claims, and thus the motion to dismiss for forum non conveniens as it applies to the Philippine plaintiffs must be denied.

### CONCLUSION

It is well-settled that defendants bear the "burden of persuasion ... [as] to all the elements of the forum non conveniens analysis." *In re Air Crash Disaster Near New Orleans, La.*, 821 F.2d at 1164. To meet this burden, defendants must put forth "unequivocal, substantiated evidence" for their position. *Baris v. Sulpicio Lines, Inc.*, 932 F.2d at 1550 n. 14. Further, "[a] forum non conveniens dismissal should never be granted ... unless the defendant can satisfy the court that an adequate and alternative forum exists." *Perusahaan Umum Listrik Negara Pusat v. M/V Tel Aviv*, 711 F.2d at 1238. Indeed, "[d]ismissal of an action because of forum inconvenience when there is in fact no alternative forum is an abuse of discretion." *Constructora Spilimerg, C.A. v.*

*Mitsubishi Aircraft Co., Inc.*, 700 F.2d 225, 226 (5th Cir.1983), citing *Gulf Oil v. Gilbert*, 330 U.S. 501, 507, 67 S.Ct. 839, 842, 91 L.Ed. 1055 (1947).

In the instant case, defendants have simply not been able to satisfy their burden of persuasion and demonstrate to the Court that Costa Rica, Honduras, or the Philippines are available fora for plaintiffs' claims, and that even if available, Honduras and the Philippines would be adequate. That is not to say that on a different record the Court might not find otherwise. As a sister court has noted, "[i]t may well be that the next defendant to face the same issue ... would reach a different result because it would marshal more—or better—proof." *In re Bridgestone/Firestone Inc.*, 190 F.Supp.2d at 1132 n. 6 (quoting *Bhatnagar v. Surrendra Overseas Ltd.*, 52 F.3d 1220, 1230 (3d Cir.1995)). Likewise, the Court's inquiry must of necessity be fact-intensive and individualized, and a change in facts (such as a scenario in which the plaintiffs were willing to make a voluntary, unreserved filing in their home countries upon dismissal, or a case involving plaintiffs from countries that did not have preemptive jurisdiction statutes) might also work a different result.[44] However, on the record before this Court, in a case presenting these facts, defendants have simply not convinced the Court that available and adequate alternative fora exist, and accordingly;

**IT IS ORDERED** that defendants' **Motion to Dismiss for Forum Non Conveniens** (Rec.Doc. 121) should be and is hereby **DENIED;**

**IT IS FURTHER ORDERED** that defendants' **Motion to Strike the Testimo-**

---

**43.** This is exactly the type of arrangement that gave rise to the term "banana republic"—an irony that is not lost on the Court.

**44.** For this very reason, the holdings in *Espinola–E v. Coahoma Chem.*, 248 F.3d 1138 (5th Cir.2001) and *Patrickson v. Dole Food Co.*, Civil Action No. 97001516 HG (D.Haw. Sept. 9, 1998), *rev'd on other grounds*, 251 F.3d 795 (9th Cir.2001), do not indicate dismissal here.

ny of **Alejandro Garro** (Rec.Doc. 154) should be and is hereby **DENIED.**